Nott, J.,
delivered tbe opinion of the court:
This is an action brought under th*e “ Abandoned or captured property act’’ to recover the proceeds of nine hundred and seventy-four bales of cotton captured at Savannah; which ];>roceeds, it is alleged, amount to $187,574 80.
Before considering the merits of the case, the court wishes to notice an implied censure of the special counsel of the Treasury, which fell from one of the counsel of the claimants — a censure which has been repeated of late in several actions and in different forms. It was said that this is an action of merits so apparent and so just, that the honor of the government requires that no defence whatever should be interposed, and the counsel of the defendants should appear merely to say that he consents' to the claimants’ recovery. It has also been intimated in this, as in other actions, that subjecting the claimants to the delay and trouble of prosecuting a suit at all for the recovery of the proceeds of their own property, is a hardship and injustice ■unworthy of and dishonorable to the government.
Noticing the second remark first, we observe that we are ■aware of no other government which, after a great civil war, has extended a like privilege to voluntary residents within the insurgent, districts, nor one which has so carefully guarded the rights of its loyal adherents (who, by the ordinary doctrine, were held to be enemies) as to secure to them a judicial investigation founded upon such simple grounds as loyalty, ownership, and a right to the proceeds. In many of these cases, as in this, the delay has bben largely of the claimants’ own choosing, they waiting till their rights were well-nigh lapsed and barred under the statute. In all of them there has been an ■unavoidable vexation arising from the imperfect mean s of defence given to the former solicitors of the court, and to the changes that have taken place among the law officers of the government. But the only injustice, if any, observable is that the Secretary of the Treasury was not compelled to invest the proceeds “for whom it may concern,” so that through these years of litigation a loyal owner would be accumulating some measure of recompense.
As to the other ground of censure, we have before this had •occasion to disapprove of precisely what the law officers of the government are blamed for not doing now, and to remind some *562 of their predecessors that this court cannot render judgment upon the admission of counsel nor of any officer of the government, and that their ’business is neither to adjudge nor to yield, but to defend the legal rights of the United States. That duty which counsel owes alike to client and to the administration of justice in all cases and in all courts — to interpose iu> technical objection nor factious delay to a fair trial upon the leg’al merits; to draw his own deductions from the evidence, but not to falsify it; to adduce authorities which may but remotely affect his case, yet not to misrepresent them; to present fully and fearlessly his own partial estimate of the measure of legal justice which should be awarded: this duty the special counsel of the Treasury, in this particular case, appears to us to have scrupulously performed.
The loyalty of the claimants is amply proven. They have-called to attest it their business friends and associates, the-mayor of the city, the collector of the port, and their own em-ployés. It is due to them that its character be stamped upon the record of this case, and the testimony of a single witness will sufficiently describe it:
“I know the fact that the firm of Bernheimer Brothers were loyal throughout the war. Mr. Simeon Bernheimer, one of the claimants with Daniel Devlin, and one of the ñrm of Brooks Brothers, acted on a committee which raised a large amount of money for the Sanitary Fair held in this city during the war— what was known as the great Sanitary Fair; of this amount the firm of Bernheimer Brothers were among the largest contributors. I know that in the beginning of the war they sent a check, unsolicited, to the treasurer of some organization connected with the raising and equipment of regiments — I think it was the NationalDefence Committee. I know that when the call was made for men, Mr. Isaac Bernheimer collected all the clerks and men employed in the store, (from sixty to seventy men;) he called them all together and made a very patriotic speech to them, exhorting them to enlist and assist in saving their country, at the same time promising that all such as should enlist would receive their wages or salary for the ensuing three months. The account of this action, on the part of Bernheimer Brothers, appeared the day following in one of the daily papers-in the city; I have read it there; I heard it was copied into other papers and commented on by them; the notice stated the- *563 fact tts JL'have stated it, and wound up by calling attention to it as an example for others to follow. We lost customers in consequence of the well-known loyalty of the firm; we refused to sell goods for cash to persons whom we had reason to suspect sympathized with the rebellion, and that was the uniform course. When the call was made, and after Mr. Bernheimer’s address, six or seven of the men promptly responded, and volunteered and wont to the war; their wages were either paid to their families or were added to their accounts and paid to them afterward; one of the men was badly wounded, and was supported by the firm for a considerable time after his return, and one or two who went Avere reengaged after their return; all were re-engaged who presented themselves at the store after their return; thej' a-pplied to me in most cases. I know the fact of the payment of wages to these men, because I was the principal book-keeper and cashier, and no cash was paid out without my knowledge.”
The claimants’loyalty, therefore, assumed that form of active patriotism which is entitled to the commendation of every tribunal wherein it is properly brought in question.
The case turns upon the single point of ownership. The question involved is the right of a northern creditor, or principal, to acquire personal property during -the pendency of the rebellion, through his southern debtor, or agent, without express authority given before purchase, and without express ratification made before capture.
The court acknowledges the aid of the learned counsel upon both sides, in whose arguments seem to have been exhausted all the analogies of mercantile law; so that all which hitherto has been said before this court, and all, as it appears to ns, that could be said upon this branch of the law, has been summed up in the masterly discussion of the case.
The position of the court upon this form of this question of ownership, within the meaning of the “ Abandoned or captured property act,” may be best stated in a few negative propositions:
1. We do not deem the defendants to stand in the place of attaching creditors, who have levied upon property in the hands of a debtor; for the reason that the defendants had no preexisting demand or equity against the property of the holder, and that all of their legal rights sprang out of, and were limited by capture.
*564 2. We do not deem, the defendants to have acquired by capture the unquestionable rights of a purchaser in good faith for a valuable consideration; for the reason that the defendants parted with nothing when they acquired the property, nor drew to themselves, by value given, the equity which courts are ever ready to maintain.
3. We do not deem the principal, or creditor, in a northern State, and the agent, or debtor, within the insurrection ary district are to be held to the requirements as to purchase and sale which the common law exacts, in favor of third persons, from such parties iu times of peace; for the reason that such requirements in times of war amount to impossibilities, and, if exacted, would prevent the remedial intent of the statute from reaching almost every claimant coming’ from a loyal State.
To illustrate our meaning more fully as to this case: In times of peace, Lippman might have telegraphed from Savannah for instructions,'and the claimants might have sent from New York directions on the same day. Lippman might have reported his purchase by mail, and the claimants might have returned their ratification within a single week. Lippman might have shipped the cotton to the claimants, and taken the bill of lading in their name, and proclaimed to all the world that it was theirs. In this past time of civil war, the debtor could do none of these things save the last, and that would have been a virtual betrayal of the property to the rebel government. The conditions laid upon the parties differed in almost all things from those of the ordinary debtor and creditor, and the analogy drawn from the law-merchant therefore fails.
The legal truth is, that these abandoned and captured property cases, in this particular, are without precedent, and, to a certain extent, must be determined by rules and principles of their own. The legal position of the defendants is complex and exceedingly difficult to be defined. As against the loyal claimant, they are but finders, holding the found property under an implied trust, and disclaiming all right or interest in the proceeds on their own behalf. As regards the disloyal owner, they are successors, acquiring by capture an absolute title to the property, and succeeding to all the equities and interests which he then possessed.
The previous decisions of this court fall into two consistent *565 classes, wliicb hare found best expression in the cases of Grossmeyer and of Bramhall, (4 C. Cls. R. p. 1, p. 51.)
1. Where the southern debtor, or agent, has reported the property at the time of capture as his northern creditor’s, or principal’s, where he has separated it from his own property, and consistently held it to await capture, exercising over it the fewest xiossible acts of ownership,, and notifying the creditor of his purchase whenever an opportunity has enabled him so to do, there we have uniformly held- the creditor, or principal to have acquired an ownership within the true remedial intent of the law.
2. Where the debtor at the time of capture has reported the captured property as his own, where he has previously treated it as such, and the ownership of the northern creditor has rested exclusively within the debtor’s breast, so that this calling it another’s might be a mere afterthought to defeat the lawful effect of the capture, there we have uniformly held the debtor to be the owner, and the pretended transfer in fraud of the act.
Excluding the testimony of Lippman, how stand the facts in this case "1
1. At the moment of capture, Lippman reported the cotton to the captors as the property of the claimants. It was received by them and entered as such on the registration book of captured cotton.
2. This cotton so reported by Lippman he had purchased as early as 1861 and 1862; he had stored it with third persons for long storage j he had kept it distinct from other cotton in which he had dealt largely, buying and selling.
3. While concealing the claimants’ alleged ownership from the public and carefully hiding it from the Confederate authorities, Lippman told the warehouseman who held the greater part of it, and with whom he was on terms of friendship and confidence, 11 that it was purchased for Bernheimer Brothers ; that it belonged to them and that it was their cotton.” He told his family so, and a friend who wished to purchase it, and he marked the cotton with the claimants’ initials.
4. At every opx>ortunity that was offered him he sent out word to the claimants of his purchase for them — by his son in 1862; by a nephew in 1863; by a friend in October, 1864; by another nephew in December following. The messages, as *566 delivered to the claimants, varied. That by the son was That utJie cotton liad been bought for them, anti that they should secure it.” That by the nephew was that£lhe had bought cotton for them“ that he had bought cotton enough to secure them — to pay what he owed .them.” That by the friend was simply that “he had bought cotton for them.'” All of these messages were* delivered to the claimants before capture, and were received by them in silence •, that is to say, they expressed neither a ratification nor a disavowal.
5. For many years before the war, Lippman and the claimants had held most intimate business relations, each party acting as the agent and business 'friend of the other. After the war had separated them, the claimants continued to take up and pay his notes as they matured to the amount of $22,133 98, and until his indebtedness reached the sum of $37,494 04 •, and Lippman collected of their southern debts during the saíne years wherein he bought the cotton, (1801-02,) $30,000. These mutual accounts still stand open between the parties, unliquid-ated and unsettled.
These five groups of facts point to an. agency rather than an interest in Lippman, and unless there be something in his deposition to the contrary, we think that at this point in the case it should be received in evidence.
When the testimony of Lippman is admitted, it adds nothing to the foregoing facts except that it establishes the point of a general authority to buy and invest. At a brief and hurried interview in February, 1861, and. with the subject of the impending war before them, the senior partner of the house of Bernheimer said to Lippman: “Mind, we have got a great deal of money out in the South, in Georgia, South Carolina, Florida, and Alabama, and I wish you to collect money for us wherever it is owing to us. You will act. to the best of your ability, and you must do so; and don’t spare any traveling expenses, if necessary. If you cannot make a remittance, in case any trouble should arise — which I don’t think will, as I am of the same opinion that you are, (however, we don’t know what a deranged people may do) — then you make such investments in lohatever you think best and safest.” Lippman, on his part, begged that the claimants “would go on and redeem his notes as usual.” The parties separated, not to meet again till the war *567 was past. lu tlie mean time, eacb seems to have kept faith, with, the other.
As Lippman has been examined and cross-examined in the ease repeatedly and at great length, it is proper'to remark that, while his testimony shows a somewhat confused state of mind as to the legal rights and liabilities subsisting' between-the claimants and himself, and doubts as to whether the net proceeds of the cotton shall be credited to him by the claimants or only the purchase-money which he paid, yet still it consistentlj- clings to the one idea that this was the claimants’ cotton; that thej~ could do what they pleased with it, and allow him what they chose. “The seven hundred and twenty bales,” he says, “stored with Wade were bought for Bernheimer Brothers, and all the rest of the cotton claimed in this, suit.” “I left that seven hundred and twenty bales stored with Wade, as the property of Bernheimer Brothers, until the cotton was taken by the United States authorities.” “The mark<^>, in the receipt, I directed to be put on. The B meant Bern-heimer.” “The three hundred bales stored with Yonge was also bought for Bernheimer Brothers.” “ It was all kept by me on storage from the time of its purchase for Bernheimer Brothers. I bought it, intending it to be the property of Bern-heimer Brothers, and ITceptit exclusively for them; never parted with a bale of it, nor sold a bale of it.” “The mark <B and B’ on the cotton in my store was put on when it was brought there. I put it on because I considered it was the property of Bern-heimer Brothers. It made the fact more evident that it belonged to them.” And upon his cross-examination: “Bernheimer Brothers have never given me any receipt on account of this •cotton, or its valuation. They have never given me any discharge on account of my indebtedness to them to the amount of this cotton or its value, or to any amount. The account between us stands just as it did. There has been no understanding between them and me that, in the event of their failure to collect this claim, my indebtedness to them shall stand as it did. Nothing has been said on that subject between them and me.”
We remark here that there is no proof in the case tending to show that this cotton was taken as a payment from the debtor to the creditor. The case depends on its having been the claimants’ cotton absolutely, under the power given to Lipp- *568 man to invest, followed by bis collection of tbeir money, by the-separate storage of the property, by the initial marks put upon it, by bis repeated messages to the claimants, by the declarations made to third persons, and by bis reporting it as theirs to the captors.
. ¥e remark, also, that there is no evidence to show that the moneys collected by Lippman were kept separated from his. own funds, and that, in fact, they were simply credited to the claimants upon his books. And we note, also, that neither the amount nor the value of his investments in the cotton in question are shown; that from the destruction of his books and papers by the Confederate army they cannot be; and that the net proceeds sought to be recovered in this action largely exceed his indebtedness to the claimants.
It is not necessary to hold in this case that when Lippman reported the cotton to the captors as the property of the claimants, it was as against himself an irrevocable act. Yet it appears that he had held that cotton through years lengthened by anxiety, adversity, and peril, always retaining it for some remote object, which was manifestly capture. When that remote object ivas attained, Lippman renounced all interest in the property as his own. It was the first moment that he could publicly and lawfully avow the ownership of the claimants, and he did so then. The avowal was coincident with the capture of the city, and took effect the instant that the law prevailed.. It evidenced the fact that the property had been held for the claimants, and hence that it had been bought for them.
Reviewing the evidence carefully, the personal dangers by which Lippman was beset, the risks which he ran, the rebel confiscation act on the one hand, the threatenings of a mob on the other, the difficulties of doing, the suspicions from leaving undone, the disasters which wrecked his own fortune, the tenacity with which he clung to the claimants’ rights, our conclusion is that Lippman did all that it was possible for human integrity to do toward vesting this property in his principals. His steadfast adherence to their interests, and his unwavering mercantile faith, were more than commendable — were noble.
In decreeing tbis property to have been the claimants’ from the time of its purchase, it is needless to say we lay aside all idea of a remaining interest or lawful equity in Lippman. The condition of his and the claimants’ affairs ivas correctly stated *569 by himself in his return to the Confederate receiver of northern confiscated debts, viz, that he owed them and that they owed him. That condition of their affairs will not be affected by any result in this suit. With the honorary obligations of merchants we have nothing to do. The legal rights of the parties fix and determine their interests. A recovery in this action will neither pay Lippman’s debt nor relieve him from his responsibilities. He gains nothing in contemplation of law by the claimants’ success, and whatever he may hope for goes only to his credibility. The case, in our judgment, does not depend upon his testimony, and the same result was reached before we admitted it in evidence. It was admitted rather that the whole truth might be more clearly displayed than from any doubt as to its necessity.
In discussing the main question in this case, we have spoken as though there were but oue parcel of cotton, or as if all depended upon precisely the same testimony. There are, in fact, no less than five, all differing somewhat as to certain minor points, perhaps essential.
1. There are 477 bales of cotton purchased in 1861 and 1862, whereof the distinctive fact is, that at the time of storage Lippman notified the warehouseman, Mr. Wade, that it was the property of the claimants.
2. There are 27 bales, also purchased in 1862, of which Lipp-man told both the vendor and warehouseman, Mr. Meyer, that it was bought and stored for the claimants.
3. There are 254 bales, also purchased in 1861 and 1862, stored with third parties, and marked with the claimants’initial, but without notice to the warehousemen of the real ownership.
4. There are 110 bales, which are in the same plight as the last, except that they were not purchased till 1864,- 41 on the 16th November, and 69 on the 7th December.
5. There are 76 bales, whereof the time of purchase is not shown, which were stored in Lippman’s own warehouse. Of these he declared to his family that they belonged to the claimants, and, like the others, he marked then with the claimants’ initials and reported them as their property.
It appears that of all the cotton stored, 727 bales were sea-island, and that of the 944 bales captured 529 were sea-island, and 407 were upland, leaving eight bales missing.
The conclusion in this case was reached in the first instance *570 without reference to the testimony of Lippmau, as has been said, and also without inquiry as to his loyalty. But the claimants, it is but just to add, hare very carefully made the loyalty of Lippman a subject of proof. On this behalf appears a constant series of consistent acts, such as opposing' secession, discouraging enlistments, helping men to flee the conscription, and sending every male member of his own family into the United States lines. On behalf of the defendants there is but a single item of opposing testimony, and it consists of Lippman’s application for a pardon. The application was made by two petitions, which allege that he held no office, civil or military; that he never bore arms; and that, “being of the opinion that he did not come within any of the exceptions of the proclamation of your excellency of the 29th day of May, 1865, he took the oatli of amnesty prescribed by the proclamation; but, having afterward learned that he should obtain a pardon, he forwarded, through the provisional governor of Georgia, his application, with said original oath annexed, but which he learns has never been received; and that he has carefully examined the exceptions of the proclamations of the 29th May, 1865, and that he is obnoxious to the thirteenth of said exceptions, and none other.”
We are fully satisfied of Lippman’s loyalty, and that it is proven affirmatively in the words of the statute that lie “did consistently adhere to the United States” during the rebellion. But whether his application for a pardon to free him from the guilt of treason may not in law be conclusive evidence of treason which no amount of testimony can overthrow, we do not deem ourselves called upon now to decide.
The judgment of the court is that the claimants réeover the net proceeds now in the Treasury of 529 bales of sea-island cotton, captured at Savannah, being $220 66 a bale, and of 407 bales of upland cotton, being $167 52 a bale; amounting, in the aggregate, to $184,909 78.*

 In this case the claimants’ counsel expressly disclaimed a right to recover the amount deducted by the Treasury for the cotton tax.